Kathy L. WHITED, Appellant–
Respondent,

v.

Kenneth B. WHITED, Appellee–
Petitioner.

No. 34A02–0507–CV–626.

Court of Appeals of Indiana.

March 28, 2006.

Rehearing Denied June 6, 2006.

Dan J. May, Kokomo, for Appellant.

Timothy P. Spahr, Peru, for Appellee.

## OPINION

CRONE, Judge.

### Case Summary

Kathy L. Whited ("Kathy") appeals the trial court's final order on her petition to modify support, petition to emancipate children, complaint for determination of arrearages on support, and motion for rule to show cause for contempt. We affirm.

### Issues

Kathy presents seven issues for our review, which we consolidate and restate as the following four:

I. Whether the trial court abused its discretion by ordering a retroactive modification of the child support obligation of Kenneth B. Whited ("Kenneth");

II. Whether the trial court abused its discretion by using the current child support guidelines to calculate a retroactive visitation credit;

III. Whether the trial court abused its discretion by denying prejudgment interest on Kenneth's delinquent child support obligations; and

IV. Whether the trial court abused its discretion by denying Kathy's request for attorney fees.

### Facts and Procedural History

We adopt the trial court's findings of fact, which are, in pertinent part, as follows:

1. This Court has personal jurisdiction over the parties and subject matter jurisdiction over pending matters in this case.

2. Petitioner (hereinafter referred to as "Kenneth") and Respondent (hereinafter referred to as "Ka-

thy") were married on September 8, 1973.

3. Kenneth and Kathy had four children, three of whom survived to adulthood. The latter three are the only children with regard to whom there is a present child support dispute.

4. The surviving children's names are Faith Frazier, f/k/a Faith Whited, DOB: January 22, 1974; Benjamin Whited, DOB: May 14, 1975; and Joshua Whited, DOB: March 9, 1977.

5. The parties' marriage was dissolved on or about December 18, 1979, with Kathy receiving custody of the parties' children.

6. An Order dated November 25, 1980, transferred custody of the children to Kenneth.

7. Then, by way of an Order dated December 5, 1985, custody of the children was transferred back to Kathy.

8. No other Orders transferring custody of the children or emancipating them were entered.

9. At various times during the ensuing years, one or more of the children would travel to Kenneth's home, either to reside with him for a time or for extended periods of visitation.

10. While Kenneth was subject to an "in gross" child support order, during times when one or more of the children had an extended stay with Kenneth he reduced the amount of child support that he paid according to the number of children he had with him at the time. When one child was with him and two children were with Kathy, Kenneth paid two-thirds of this court ordered support obligation. When two children were with him and one child was with Kathy, Kenneth paid one-third of his court ordered support obligation. Finally, when all three children were with him, Kenneth did not pay any portion of his child support obligation.

11. During those times, Kathy provided Kenneth no funds whatsoever for the care or support of the children. Kenneth provided any and all funds for the care and general assistance of the children during those times when they lived with him and not with Kathy.

12. On August 2, 1990, Kathy filed a Petition to Modify Support, Motion for Wage Assignment/Determination of Arrearages, and Motion for Rule to Show Cause. While that pleading was pending, a deposition of Kathy was taken on September 27, 1990. That deposition was subsequently filed and made a part of the Court's file.

13. During said deposition, Kathy acknowledged that "you can usually tell by my support records when the children were with him and not with me." Deposition, September 27, 1990, at 31.

14. Kathy further acknowledged during said deposition that she did not believe that Kenneth owed her "a support payment for any of the periods of time that the children actually resided with him under his care and control and under his roof." Id., at 103.

15. She further acknowledged during said deposition that "[Kenneth's] always been pretty good about paying me support." Id., at 104. Kathy also acknowledged during said deposition that she was making no claim for any unpaid support dur-

ing times when one or more of the children were with Kenneth.

16. Subsequent to the taking of Kathy's deposition on September 27, 1990, Kenneth's child support obligation was increased to $173.00 per week, beginning on March 15, 1991.

17. The Order, like previous orders in the case, did not provide for Kenneth to make reduced child support payments when one or more of the children were with him.

18. Eventually, all three of the children left Kathy's home in Florida to return to Indiana.

19. Due to the passage of a significant amount of time, the memories of all involved make it difficult to set a time line for all relevant events.

20. However, because of the arrangement under which Kenneth would reduce his child support payments when children were with him, Kenneth's child support payment history offers some guidance. The presence of one or more of the children in Indiana can be tracked by reviewing Kenneth's support payment records in order to clarify the parties' other testimony.

21. Beginning around the end of December 1992, Benjamin moved back to Indian[a] to live on Kenneth's property. Benjamin was no longer in school and held a full-time job, first at Mace's grocery store in Peru, Indiana, and then, when he was 18 years old, with Chrysler in Kokomo, Indiana.

22. Joshua moved back to live on Kenneth's property in November 1993. He, too, never returned to school and consistently held a full-time job after that point.

23. Having graduated from high school in June 1993 and never having re-turned to school thereafter, Faith moved back to Indiana, apparently somewhere between November 1993 and April 1994.

24. It is disputed and unclear how much time Faith spent in her father's home after her return to Indiana. Conflicting testimony indicated that Faith may have been in Kenneth's home for up to four months. Faith also apparently spent some time living in her grandmother's home and on her own in an apartment with a friend.

25. As was the case at all times when the children lived with Kenneth, while Faith was living outside Kenneth's home in Indiana, Kathy did not provide any financial support to Faith.

26. Faith held a series of jobs during 1994 and 1995. In 1994, she held jobs with Hardee's, a/k/a Norris Food Service, Inc., in Kokomo, Indiana; Century Villas, Inc., in Greentown, Indiana; and Manorcare Health Services, Inc., in Indiana, as well. In 1995, she held jobs with Manorcare Health Services, Inc., and Miller's Health Systems, Inc., in Indiana. She then held jobs with three more employers in Florida.

27. Based upon the employment records submitted to the Court, it appears that Faith did not return to Florida until at least February 1995, if not even later.

28. By the time she returned to Florida, she was 21 years old, having reached that age on January 22, 1995.

29. In this case, the parties have agreed that, without question, all of the children were emancipated no

later than March 9, 1995, when Joshua reached the age of 18, and so Kenneth's basic child support obligation would not in any event have accrued after that date.

30. Pursuant to the parties' past agreement as acknowledged by Kathy on September 27, 1990, for the remainder of the time that Kenneth paid child support to Kathy, he continued to reduce his child support payments according to the number of the children who were staying with him and/or not living with Kathy at the time, and by agreement of the parties, Kathy continued to not give any funds whatsoever to Kenneth for the care of the children or to the children themselves while they were with him.

31. Kenneth made his last child support payment on November 10, 1993.

32. As of April 22, 2004, Faith was 30 years old, Benjamin was 28 years old, and Joshua was 27 years old.

33. Over a period of approximately one year (between late 1992 and early 1994), all three of the children moved out of Kathy's home and returned to Indiana to live with Kenneth. Benjamin and Joshua never returned to Kathy's home, and Faith only returned after she had reached the age of 21 and had been emancipated.

34. Kathy did not pay any child support to Kenneth during the whole time that the children lived with him, even though it was undisputed that Kenneth was paying a substantial amount of money for the children's care while they were living in Indiana.

Appellant's App. at 12–15.[1]

On April 22, 2004, Kathy filed a petition to modify support, petition to emancipate children, complaint for determination of arrearages on support order, and motion for rule to show cause for contempt. On April 27, 2004, Kathy filed a motion for change of venue, which the trial court granted the next day. The case was transferred to Howard Superior Court III on May 17, 2004. On January 4 and February 2, 2005, the trial court heard evidence in the case. On March 24, 2005, the trial court issued its findings of fact and conclusions thereon and directed the parties to file proposed child support arrearage calculations.

On April 25, 2005, Kathy filed a motion to correct error, motion for entry of new findings of fact and conclusions thereon, and a calculation of child support arrearage. On May 10, 2005, Kenneth filed a statement in opposition to Kathy's motion to correct error. On May 17, 2005, the trial court issued its final order. The court's conclusions state, in pertinent part:

9. The court calculates the arrearage and parenting time credit as follows:

 (a) From March 1, 1991 through March 9, 1995 [Kenneth] paid $16,817.83 in support. (March 1, 199[1] is the day the support order was modified to $173.00 per week and March 9, 1995 is the day the youngest child reached 18 years of age).

 (b) From March 1, 1991 to November 10, 1993 [Kenneth] owed $12,283.00 in support ($173.00 × 71 weeks).

---

1. We direct Kathy to Indiana Appellate Rule 51(C), which states: "All pages of the Appendix shall be numbered at the bottom consecutively, without obscuring the Transcript page numbers, regardless of the number of volumes the Appendix requires."

(c) On November 10, 1993 the youngest child moved to Indiana to reside with [Kenneth] and [Kenneth] stopped paying support.

(d) Pursuant to the Indiana Child Support Rules and Guidelines the maximum calculated parenting time credit is 183 overnights. At this rate the court calculates a credit for the [Kenneth] in the amount of $80.00 per week lowering the child support payment to $93.00 per week (see exhibit A).

(e) Factoring in the parenting time credit the court calculates that from November 9, 1993 through March 9, 1995 [Kenneth] would have owed $6,324.00 ($93.00 per week × 68 weeks).

(f) The court finds that from March 1, 1991 through March 9, 1995 the total amount of support owed was $18,607.00 ($12,283.00 + $6,324.00 = $18,607.00).

(g) The court finds that the [Kenneth] owes $1789.17 in support ($18,-607.00—16,817.83 = $1,789.17)

(h) The court further finds that due to [Kathy's] delay in enforcing this order and the relative uncertainty as to the calculation of support owed no prejudgment interest entered on this amount is owed.

(i) The court further finds that no attorney fees are awarded to [Kathy].

*Id.* at 16–17. Also, the trial court, at Kathy's request, dismissed her motion for rule to show cause for contempt.

On May 25, 2005, Kathy filed another motion to correct error as well as motions to proceed as an indigent person and for appointment of attorney to prosecute appeal. On June 2, 2005, Kenneth filed a statement in opposition to Kathy's second motion to correct error. On June 13, 2005, the trial court denied Kathy's second motion to correct error. That same day, the trial court granted Kathy the right to appeal its decision with no costs. Kathy now appeals.

**Discussion and Decision**

### I. Retroactive Modification of Child Support Order

Kathy claims that the trial court erred by ordering a retroactive modification of the child support order of February 27, 1991. Decisions regarding child support are within the sound discretion of the trial court. *Smith v. Smith,* 793 N.E.2d 282, 284 (Ind.Ct.App.2003). We will reverse the court's determination only if there has been an abuse of discretion or the trial court's determination is contrary to law. *Id.* It is the long-standing rule in Indiana that a noncustodial parent may not unilaterally reduce a support order in gross. *Nill v. Martin,* 686 N.E.2d 116, 117 (Ind.1997). The law frowns on a custodial parent's agreement to modify the arrangement outside of court because that parent, as a constructive trustee of the child support funds, may not contract away the benefits of the trust. *Id.* at 118. Generally, once funds have accrued to a child's benefit under a court order, the court may not annul them in a subsequent proceeding. *Id.* There are a few exceptions to this rule, however, one of which is described in *Isler v. Isler*:

We are of the opinion that a narrow exception to the rule may exist in a case where the obligated parent, by agreement with the custodial parent, has taken the child or children into his or her home, has assumed custody of them, has provided them with food, clothing, shelter, medical attention, and school supplies, and has exercised parental control over their activities and education for such an extended period of time that a

permanent change of custody is demonstrated. In such a case the court may, in its sound discretion, allow credit against the accrued support for the reason that the obligated parent has merely furnished support in a different manner under circumstances easily susceptible of proof.

425 N.E.2d 667, 670 (Ind.Ct.App.1981), *opinion on reh'g.*

Here, there is no dispute that as of November 10, 1993, each of the three children was either emancipated or living with Kenneth on a permanent basis. For guidance, the trial court looked to the decision of another panel of this Court in *Smith,* 793 N.E.2d at 282, where we applied the *Isler* exception in a modification dispute with similar facts. In *Smith,* the parties had two daughters, Heather and Melissa. Pursuant to the settlement agreement approved by the trial court, the mother was awarded custody of both children, and the father was ordered to pay child support of $76.00 per week in gross. Shortly after the dissolution was final, Heather moved to her father's Florida home and resided there for over two years. Melissa remained with her mother during that time. Then, the daughters essentially switched places—Heather moved back in with her mother and resided there until her emancipation more than a year later, and around the same time, Melissa moved to Florida to live with her father until her emancipation three years later. During these times when one daughter resided with the father and one with the mother, the parents agreed that the father would pay no support, and each parent would simply provide support for the child in his or her care.

Although the parties had verbally agreed to modify the court-approved set-

tlement agreement, neither one sought a judicial modification. Several months after both daughters were emancipated, the State filed a petition requesting the court to determine the amount of arrearage owed by the father. In reviewing the case, we noted the longstanding law of implied contract:

> An implied contract, that is, one wherein an agreement is arrived at by the acts and conduct of the parties, is equally as binding as an express contract, wherein the agreement is arrived at by their words, spoken or written. In either case it grows out of the intention of the parties to the transaction.

*Id.* at 285 (quoting *Retter v. Retter,* 110 Ind.App. 659, 663–64, 40 N.E.2d 385, 386 (1942)). Applying this rule to the circumstances in *Smith,* we found that "it is apparent that while [the father and mother] did not enter into an express written contract concerning the custodial arrangement, their conduct gave rise to an agreement by implication." *Id.* We noted that the father exercised primary custody over one of his daughters at all times relevant to this dispute, and that both parties agreed to this modified arrangement. It was also significant that "[the mother] did not raise a voice in protest until April 2002—more than six years after Heather began living with [the father]." *Id.*

Applying this Court's reasoning in *Smith* to the instant case, we find that similarly, Kathy and Kenneth's conduct—allowing each of the children to live with Kenneth indefinitely, and agreeing to a reduction in Kenneth's support obligation—created an implied contract. Like the mother in *Smith,* Kathy waited a long time—over ten years—before raising an issue regarding child support arrearage.[2] While we agree with Kathy that this passage of time does not bar her claim, the

2. The youngest child, Joshua, is now twenty- nine years old.

trial court appropriately considered Kathy's delay in filing her petition to modify as conduct that supports the finding of an implied contract in this case.[3]

While we emphasize the narrowness of the *Isler* exception, we conclude that it was properly applied in the instant case. Kathy and Kenneth, through their conduct, impliedly agreed to a permanent change of custody following the trial court's 1991 support order. Therefore, the trial court's order of retroactive modification was appropriate, and we find no abuse of discretion.

## II. Calculation of Child Support Credit

■ Kathy contends that the trial court abused its discretion by using the current child support guidelines to calculate a retroactive visitation credit. She claims that Kenneth is entitled to no visitation credit under the guidelines that were in effect when the trial court issued the 1991 child support order. She provides no valid authority for her position, however.[4] In fact, Kathy cites the current version of Indiana Child Support Guideline 6, which states in pertinent part:

The Guideline support schedules do not reflect the fact, however, [that] when both parents exercise parenting time, out-of-pocket expenses will be incurred for the child(ren)'s care. These expenses were recognized previously by the application of a 10% visitation credit and a 50% abatement of child support during periods of extended visitation.

*See* Appellant's Br. at 19. If the trial court had applied this prior credit formula to the instant case, then Kenneth would have received a 50% abatement of his child support obligation from November 10, 1993, through March 9, 1995. His obligation was $173.00 per week during that period; therefore, he would have received a credit of $86.50 per week. By applying the current guidelines, the trial court gave credit to Kenneth for the maximum number of overnights—183—and credited him $80.00 per week. Interestingly, if the trial court had applied the former guidelines, as Kathy suggests, Kenneth would have received a greater credit. Therefore, she actually benefited from the court's use of the current guidelines. We find no abuse of discretion in the trial court's calculation

---

3. Kenneth argues that Kathy's claim is barred by the doctrine of laches. We agree with Kathy, however, that laches does not apply to child support cases. This Court will not penalize children for their parent's delay in pursuing child support. *Knaus v. York*, 586 N.E.2d 909, 914 (Ind.Ct.App.1992).

4. Kathy states, "The guidelines formerly provided that the Courts could not grant the abatement unless the support order specifically provided for a visitation credit." Appellant's Br. at 19. The case she cites for this proposition, however, is unpersuasive. *See Cohoon v. Cohoon*, 770 N.E.2d 885 (Ind.Ct. App.2002), *aff'd in relevant part by* 784 N.E.2d 904 (Ind.2003). In *Cohoon*, the father was ordered to pay $80 per week for the support of one child. He did not pay any support during a period of twenty-five weeks in which he had extended visitation with the child, and the mother filed a petition for contempt cita-

tion. At the hearing, the father testified that he had mistakenly thought that he was entitled to a complete abatement during extended visitation periods. We found, however, that "[n]othing in the dissolution order indicates that Father was entitled to a 100% abatement of his weekly support obligation during his extended periods of visitation with M.C." *Id.* at 895. We affirmed the trial court's finding of contempt for the father's nonpayment of child support. In *Cohoon*, the fact that there was no mention of a potential abatement in the dissolution order was relevant only to the issue of contempt, not to the issue of whether the father would have been entitled to an abatement for extended visitation under the child support guidelines. The latter issue was not considered in *Cohoon*, as there was no evidence that the parties had agreed, even impliedly, to alter the court's support order.

of Kenneth's remaining child support obligation.

### III. Prejudgment Interest

 Kathy argues that the trial court abused its discretion by failing to award prejudgment interest on Kenneth's support obligation. Indiana Code Section 31–16–12–2 provides in pertinent part: "The court *may*, upon a request by the person or agency entitled to receive child support payments, order interest charges of not more than one and one-half percent (1½%) per month to be paid on any delinquent child support payment." (Emphasis added.) Clearly, this statute permits the trial court to exercise discretion.

When reviewing a decision regarding an award of prejudgment interest, our standard of review is for an abuse of discretion, focusing on the trial court's threshold determination as to whether the facts satisfy the test for making such an award. The decision to award prejudgment interest rests on a factual determination and this court may only consider the evidence most favorable to the judgment.

We note that the crucial factor in determining whether damages in the form of prejudgment interest are allowable is whether the damages were ascertainable in accordance with fixed rules of evidence and accepted standards of valuation. An award of prejudgment interest is proper only where a simple mathematical computation is required. Damages that are the subject of a good faith dispute cannot allow for an award of prejudgment interest.

*Bopp v. Brames,* 713 N.E.2d 866, 872 (Ind. Ct.App.1999) (citations omitted), *trans. denied.* Further, pursuant to Indiana Code Section 34–51–4–8(b), "[t]he court shall exclude from the period in which prejudgment interest accrues any period of delay that the court determines is caused by the party petitioning for prejudgment interest."

 Here, the trial court decided not to award prejudgment interest because of Kathy's delay in enforcing the 1991 child support order and because of the "relative uncertainty as to the calculation of support owed." Appellant's App. at 17. The court's decision was well within its discretion, and we will not second-guess its weighing of the evidence.

### IV. Attorney Fees

Finally, Kathy disputes the trial court's denial of her request for attorney fees. Like the prejudgment interest statute cited above, the attorney fees statute relevant to child support cases is discretionary: it provides that the trial court *may* order a party to pay a reasonable amount for the other party's attorney fees. *See* Ind.Code § 31–16–11–1. A determination regarding attorney fees in proceedings to modify a child support award is within the sound discretion of the trial court and will be reversed only upon a showing of a clear abuse of that discretion. *Searcy v. Searcy,* 583 N.E.2d 1216, 1221–22 (Ind.Ct.App. 1991). In determining whether to award attorney fees, the trial court must consider the parties' resources, their economic condition, their ability to engage in gainful employment, and other factors that bear on the award's reasonableness. *Id.* at 1222. The trial court, however, need not cite the reasons for its determination. *Collier v. Collier,* 696 N.E.2d 47, 53 (Ind. Ct.App.1998), *aff'd in relevant part by* 702 N.E.2d 351 (Ind.1998).

Kathy argues that because she earns less income than Kenneth, the trial court should have ordered him to pay her attorney fees. We disagree. "A disparity in Husband's annual income and Wife's household annual income alone is insuffi-

cient to compel a trial court to grant attorney's fees." *Kovenock v. Mallus,* 660 N.E.2d 638, 643 (Ind.Ct.App.1996), *trans. denied.* Thus, we find no abuse of discretion.

Affirmed.

FRIEDLANDER, J., and MAY, J., concur.